902

## PENNSYLVANIA R. CO. v. FIDELITY & DEPOSIT CO. OF MARYLAND.

### No. 17540.

District Court, E. D. Pennsylvania.

Nov. 13, 1936.

George G. Chandler and Robert T. McCracken, both of Philadelphia, Pa., for plaintiff.

John Russell, Jr., William Clarke Mason, and Francis B. Bracken, all of Philadelphia, Pa., for defendant.

DICKINSON, District Judge.

The legal merits of this cause cannot be appraised without a fact statement. In making this we shall adopt the kindergarten method. The jury rendered a verdict for the plaintiff. This was on the basis that there was no defense and that the case was in consequence one of damages only. The plaintiff asked for damages aggregating in round figures $5,200,000. The verdict of the jury was for $747,663.-02. The trial judge excluded items aggregating about $4,500,000. The verdict was for all the other items as claimed. It is a fair inference that, had the rejected items not been excluded, the verdict would have included them. The defendant has not asked for a new trial. If there was error in excluding the rejected items, the plaintiff should have a new trial so that these items might be included. If they were properly excluded, then a new trial could be of no advantage to the plaintiff, but the practical effect of it would be to give the defendant whatever hope of a verdict for the defendant a new trial might

offer. For this the defendant has not asked. This reduces the questions now presented to the single one of the correctness of the trial rulings made.

### The Fact Situation.

The action is on a contract which included the construction of what we will call warehouse buildings on the land of the plaintiff. An understanding of the general scope of that contract is necessary to that of the legal questions raised. The railroad owned lands which were available for warehouse purposes but which were in use for railroad trackage. The locus in quo was what we will call the New York freight terminal of the railroad. The benefit to the railroad of having warehousing facilities are obvious. Directly they gave promise of a profitable return from the investment. Indirectly they would stimulate the patronage of the railroad. Warehouses might have been built by the owners of the land outside of, but adjoining, the railroad lines. In such case the benefits to the railroad would have been those which we have called indirect. The railroad (the law permitting) might have itself, or through a construction contract, have erected on its lands the warehouses. In such case the warehouses would have been built at its expense and all the benefits would have accrued to it. Neither of these plans was followed, but a third plan was devised. This was in outline to have the railroad lease the required land for a term of years to a Warehouse Company which should build the warehouses and recoup itself for the cost out of the earnings of the warehouses during the term of the lease. Obviously the success of this plan, in the sense of its being carried out to the profit of all concerned, rested upon the expectation that the returns from the warehousing business would be sufficient to meet the entire outlay made. The promised benefits to the railroad were: (1) It would be relieved of the payment of taxes on its land and on the erected buildings as provided in the lease; (2) it would receive rental for its land during the running of the lease; and (3) it would fall heir at the end of the term to the constructions made without further cost to it. These benefits were of course dependent upon the Warehouse Company complying with its contract. To assure such compliance the Warehouse Company gave the bond in suit upon which the defendant became surety.

## The Legal Situation.

The theory of the action brought is that the Warehouse Company defaulted in its contract to the damage of the plaintiff and demand is made upon the surety to make good the loss. This calls for the statement of further facts. The obligations assumed by the Warehouse Company were in substance (1) to pay the taxes assessed upon the land and constructions; (2) to pay the rent reserved; and (3) to construct the warehouses within the time called for and surrender them to the railroad at the end of the term clear of liens. To enable it to do this it must be supplied with the needed funds. The plan for financing the Warehouse Company was an issue of stock and issues of first and junior bonds secured by a mortgage of its leasehold interest in the lands with the anticipated warehouses erected thereon. It rested upon the expectation that these issues of stock and bonds would supply the needed money to enable the Warehouse Company to comply with its contract and that the rentals or other returns from the warehouses would further enable it to pay its bonds and retire its stock on terms satisfactory to its managers and stockholders. For some reason not fully nor very clearly disclosed by the evidence, the Warehouse Company was disappointed in its expectations, and, after the contract had in part progressed toward completion, a crisis arose. The Warehouse Company foresaw a failure in the carrying out of the plan unless it could be supplied with fresh funds.

It may be well to pause here to follow the example of mariners by taking a sight to determine our latitude. The lands upon which the warehouses were to be erected were occupied by the tracks of the railroad. It need not be said that these tracks must be removed before the agreed constructions could be built. Recognizing this, the railroad had agreed to remove its tracks so as to permit the construction to proceed.

The plan above outlined contemplated in its entirety two things. One was that the Warehouse Company should complete the contemplated constructions. For this the surety was responsible. The other was that the Warehouse Company raise through an issue of its stock and bonds enough money to finance its operations. Any one was at liberty to invest in these securities. Any one included the Railroad Company, and it felt such interest in the project that it agreed to take, and took, $1,500,000 of the junior bonds referred to. It is perfectly clear that the surety was not answerable for the value of these securities. If, for illustration, the planned construction had been completed but, because the expected returns from the warehousing business were not realized so that the bonds were not paid and the stockholders received nothing, no one would assert that the Surety Company was bound to make good the loss.

With this situation in mind, we revert to what we have called the crisis. The Warehouse Company felt the imminence of a default. It could not pay its workmen nor the subcontractors what was due them. It further felt that, if it had financial assistance, it could complete the construction. It took its financial troubles to the railroad. To command a hearing, it, with justification or without it, assumed an aggressive attitude. It charged the railroad with a violation of its contract in its refusal to remove its tracks, thereby delaying the construction and very substantially increasing its cost. The Warehouse Company further announced its intention to declare a default and demand its damages unless the railroad gave it the financial help it needed.

Let us pause again to appraise the rights and obligations of the parties at this juncture. It was clearly the right of the Warehouse Company, if the facts warranted it in so doing, to declare a default and seek to recover its damages, if any, or to waive the default and to continue its contract. The railroad was under no legal obligation to extend financial aid to the Warehouse Company, but it had the right to so do. If it refused, it had the right to demand that the contract be completed and, upon the refusal to proceed with it, to declare a default with all its legal consequences. The contest would then have been between the two declarations of default, and the issue would have been whether the railroad had been guilty of any default which justified the Warehouse Company in calling the contract off. We have said the railroad was under no legal obligation to extend financial assistance. In all fairness, however, the practical situation should likewise be appraised. This was that arrears of wages were due workmen and bills of subcontractors were overdue. Practically the work of completing the warehouses had to be done. Whatever the legal rights of the parties,

the work could not in truth be done without the payment of these bills.

The problem thus presented was taken to the surety, and it was agreed that the railroad might advance moneys to the Warehouse Company without affecting in any way the rights and obligations of the present plaintiff or defendant. The railroad thereupon made very substantial advances, taking the precaution to see that the money was applied to work which had been done on the job and by arranging for the issuing to the railroad of bonds secured by the mortgage which we have already mentioned. Had the funds advanced been sufficient to meet the requirements of the completion of the work, we probably would not have been troubled with this controversy. It, however, proved insufficient, and the railroad was appealed to for further help. At one time or the other, the terms upon which the advances were made were agreed to between the warehouse and the railroad by the former releasing the latter from all claims of a default under the contract and modifying the latter in certain respects, including the taxes and rents to be paid. This was done without the consent of the surety and without notice to it or its knowledge. The railroad had, however, in the meantime made a general complaint to the surety of the failure of the Warehouse Company to meet its contractual obligations. The final outcome was that the railroad declared a default, and, upon failure of the surety to complete the contract for its principal, completed it at its own cost and brought this action against the surety. It is to be noted that the action, although upon the contract executed by both the Warehouse Company and the surety, is against the surety alone. The obligation, however, is a joint and several one.

### The Trial Situation.

The case was tried with the case of Pennsylvania R. Co. v. Fidelity & Deposit Co. of Maryland, 81 F.(2d) 526 ruled by the Circuit Court of Appeals as our guide. That case had ruled that the release executed by the Warehouse Company did not relieve the surety of its obligation except pro tanto the damage actually suffered by the surety thereby. The defendant was permitted to defend that the railroad had violated its contract by its refusal to remove its tracks from the land in question with the delay and the enhanced cost of construction thereby incurred. The verdict of the jury, however, must be accepted as a finding of no default by the railroad. The case thus becomes wholly one of damages. The plaintiff recovered for all its damages as claimed except the items excluded by the trial court. The excluded items were all of advances made by the plaintiff to the Warehouse Company to assist it in financing its part of the project and made before and to avoid default in its contract to complete the warehouse constructions. One item was the $1,500,000 paid for the issue of junior bonds which the railroad had agreed to take. This is an illustration of the ground upon which all were rejected.

### Discussion.

The length of the fact recital given leaves no place for more than a statement of the reason for the rejection of certain items of claim. This is that the undertaking of the Warehouse Company was to do two things. One was to construct the warehouses. The other was to finance the whole project. A failure to do either meant loss to all who had invested in the venture. The defendant was surety for the undertaking to pay taxes and rent and to complete the construction. It did not underwrite the financing obligations of the Warehouse Company. The plaintiff had the right to recover, and has recovered, for the taxes, the rent, and the cost to it of completing the construction after the default of the warehouse. As we have said, any one was at liberty to have rendered the financial aid which the plaintiff gave before default, and in order to escape it. Had a third party furnished this help, he surely would have had no claims against the defendant. The circumstance that the plaintiff was the one who supplied the assistance does not render the defendant liable. We adhere to the rulings made.

The rule for a new trial is discharged, and judgment may be entered on the verdict.